UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/12/2018

-------------------------------------------------------X
                                  :

AJAMU OLUTOSIN,              :

                      :

              Plaintiff,     :        14-cv-00685 (NSR)

    -against-             :       OPINION AND ORDER

                      :

WILLIAM LEE, *et al.*       :

                      :

              Defendants.   :
-------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge:

      Plaintiff Ajamu Olutosin ("Olutosin," or "Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 ("§ 1983") against various personnel who currently work or formerly worked at the Green Haven Correctional Facility ("Green Haven"), including retired Deputy Superintendent of Security ("DSS") Raymond Koskowski, retired supervisor Richard Ryan, Dr. Frederick Bernstein, Correction Officer ("C.O.") William Bresett, C.O. Clifford Gunsett, C.O. Aaron Coffin, C.O. Jason Brothers, and C.O. Sean Carlson (collectively, "Defendants"), asserting violations of his rights under the First, Eighth, and Fourteenth Amendments. Before the Court is Plaintiff's motion for summary judgment (ECF No. 136) which boils down to two claims against the Defendants arising out of events that transpired at Green Haven. First, Plaintiff contends that Ryan, Koskowski, Bresett, Gunsett, Brothers, Carlson, Bernstein and Coffin committed a variety of acts against the Plaintiff during the period between December 2010 and August 2011, in retaliation for filing an earlier lawsuit, including that one or more defendants (1) deliberately moved Plaintiff to different double-bunk cells every few days to prevent the Plaintiff from accessing the law library and making commissary purchases; (2) used excessive force

1

against him (3) denied Plaintiff medical treatment and care ; and (4) impeded his access to the courts. Second,  Plaintiff claims that Defendants Bresett, Gunsett, Brothers, Carlson and Coffin used excessive force against him when they purportedly, unprovoked, beat him up on Feb. 1, 2011, while he was incarcerated at Green Haven.

Defendants have filed a cross motion for summary judgment (ECF No. 140) on the retaliation and excessive force claims. They also argue that Defendants Bernstein, Ryan and Koskowski are entitled to qualified immunity.  For the reasons set forth below, Plaintiff's Motion for summary judgment is DENIED  and Defendants' cross motion for summary judgment is GRANTED in part and DENIED in part.

## I.    BACKGROUND

The facts are taken from the parties' Rule 56.1 statements, affidavits, declarations, and exhibits, and are not in dispute except where so noted.

On February 13, 1987, following a jury trial, Plaintiff was convicted of one count of intentional murder and one count of felony murder, both in the second degree, two counts of robbery in the first degree and one count of attempted murder in the second degree.  He was sentenced to an aggregate term of 58 ½ years in prison. *William Riley v. Superintendent James Conway*, No. 06-CV-1324 DLI, WL 839477 at *2 (E.D.N.Y. March 7, 2011).  Plaintiff is currently incarcerated at Shawangunk Correctional Facility.

This is Plaintiff's second lawsuit in this Court against Green Haven prison employees. On April 14, 2010, Plaintiff filed a lawsuit (the "2010 Lawsuit") under 42 U.S.C. § 1983 against Senior Corrections Counselor Luis Gonzalez, Corrections Counselor Gail Daugherty, and Superintendent Robert Ercole, all employed at Green Haven.  *Olutosin v. Ercole, et al.*, No. 1:10-cv-3143 PGG (S.D.N.Y March 21, 2011). In the 2010 lawsuit, Plaintiff alleged he was double-

celled at Green Haven, meaning he shared with another inmate a cell designed for a single inmate, from November 3, 2006 until March 9, 2007. (*Ercole*, at 1-2). The 2010 lawsuit alleged that the Defendants violated Olutosin's due process rights by transferring him from Green Haven to Great Meadow Correctional Facility ("Great Meadow") on December 31, 2007, purportedly in retaliation for his refusal to sign a waiver volunteering to be "double celled" for more than 60 days. (*Id*. at 2.) The 2010 lawsuit was dismissed for failure to state a claim and the case was closed. (*Id*.) Ercole, Gonzalez, and Daugherty are not parties in this 2014 action, and no defendants in this 2014 Lawsuit were parties to the 2010 Lawsuit. (*Id.*)

On December 20, 2010, Plaintiff was transferred from Great Meadow Correctional Facility ("Great Meadow") to Green Haven. (*See* Defendant's Response to Plaintiff's Rule 56.1 Statement ("Counter Statement") ¶1, ECF No. 14.) Plaintiff's 2010 Lawsuit was still pending when he arrived at Green Haven.[1] On Dec 22, 2010, according to Plaintiff's testimony, Plaintiff went down to the draft room at Green Haven to retrieve his property bags. ( Plaintiff's Affidavit In Support Of Motion For Partial Summary Judgement ("Plf. Aff.") ¶9, ECF. No. 137; Plaintiff's Deposition Transcript ("Plf. Dep. Tr.") at 34:15-19, December 19, 2016, ECF No. 137, Ex. 1.) When correctional officers were doing a contraband check, Plaintiff testified that he told the officer doing the check that his typewriter was missing. (Plf. Dep. Tr. 34:20-24; 35:21-25 and 36:1-14.) Plaintiff testified that an officer standing behind him in the draft room said, "That's what happens to inmates who file lawsuits." (*Id.*) Plaintiff testified that he did not see who made the statement. (Plf. Dep. Tr. 35: 4-6.) He also testified that he could not remember the name of the officer in front of him who was doing the contraband check. (Plf. Dep. Tr. 36:15-17.)

---

[1]Defendants make an obvious error of fact in their counterstatement. They allege the lawsuit was dismissed on April 14, 2010, when in fact that is when the 2010 lawsuit was filed.

In sworn affidavits, all of the Defendants state they were not aware of the Plaintiff's 2010 Lawsuit. (*See* Defendant's Response to Plaintiff's Rule 56.1 Statement ("Counter Statement"), ECF No. 143, Ex. A, Koskowski Declaration ("Koskowski Decl.") ¶14; Ex. B, Ryan Declaration ("Ryan Decl.") ¶14; Ex. C, Bernstein Declaration ("Bernstein Decl.") ¶11; Ex. D, Bresett Declaration ("Bresett Decl.") ¶¶20, 21; Ex. E, Gunsett Declaration ("Gunsett Decl.") ¶¶ 20,21, 23; Ex. F, Coffin Declaration ("Coffin Decl.") ¶¶10,11; Ex. G, Brothers Declaration ("Brothers Decl.") ¶¶15, 17; and Ex. H, Carlson Declaration ("Carlson Decl.") ¶¶11, 12. Defendants contend that Plaintiff's testimony, that he informed an officer about his missing typewriter bag, cannot be accepted as true because the testimony is not admissible evidence supporting the alleged facts. (Counter Statement ¶13.)

### A.    Transfers within Green Haven

On December 29, 2010[2], 2010, Plaintiff was transferred from the H-Block to the G-Block and placed in a double bunk cell with an inmate who smoked. (Plf. Dep. Tr. 164: 1-25.) Plaintiff complained, bringing the issue to the attention of the G-Block supervising sergeant, Sergeant Murphy. (*Id*.) On January 3, Plaintiff was moved to E Block. (Declaration of Colleen K. Faherty In Support of Defendant's Motion for Summary Judgment ("Faherty Decl."), ECF No. 145, Ex. R, Declaration of Carol Ann Murphy ("Murphy Decl.") ¶9.) On January 5, 2011, Plaintiff was ordered to move again to another bunk in E Block, which was on a different tier. ( Faherty Decl. Ex. K*).* He refused to move, complaining that such repeated moves were preventing him from accessing the Facility's law library and from making Commissary purchases. (Plf. Aff. ¶13.)

Sgt. Murphy, who is not a Defendant in the lawsuit, was alerted to the problem and wrote a misbehavior report in response to the incident. (Faherty Decl. Ex. K.*)* In the report, Sgt.

---

[2]Plaintiff contends it was December 28, but Murphy Decl. Ex. B shows a record of Plaintiff's internal movements and that the official effective date was December 29.

Murphy wrote that the Plaintiff told him he had medical clearance to be bunked on the "bottom only." Sgt. Murphy wrote that no medical restrictions were confirmed and that "Inmate Olutosin had lied."[3] (Faherty Decl. Ex. K.) Plaintiff was then removed to the Special Housing Unit ("SHU") on the same day because he violated the order to move. (*Id.*; Ex. R, at 2.) Plaintiff stayed at the SHU until January 28, 2011(Plf. Aff. ¶15) when he was released from the SHU into keep-lock status back on the H-Block, pending a next available double-cell placement. (Plf. Dep. Tr. 48: 2-13; Murphy Decl. Ex. B) On February 1, Plaintiff was moved from H-Block to A-Block. (Murphy Decl. Ex. B.) At this point, Plaintiff had been moved internally six times between Dec. 20, 2010 and February 1, 2011. (Murphy Decl. ¶9; Murphy Decl. Ex. B.)

Defendant Koskowski stated in a sworn affidavit that when he was Deputy Superintendent of Security at Green Haven, he did not deliberately move Plaintiff to various double-cell assignments to prevent the Plaintiff from accessing the facility's law library and commissary (Faherty Decl. Ex. A ¶3.) As part of his duties, he stated that he was responsible for overseeing the placement of inmates in double-bunk cells. (*Id.* ¶4.) He stated that he relied on his subordinate captain to determine the appropriate placement of inmates in double-cell housing (*Id.* ¶7.) Koskowski's subordinate captain is not a defendant in this lawsuit.

Koskowski stated that it was routine for inmates to move at Green Haven, depending on a variety of factors. (*Id.* ¶10.) Koskowski stated that he was responsible for the supervision of 2,200 inmates at the facility. (*Id.* ¶12.) He stated that he never instructed a subordinate to take retaliatory action against the Plaintiff. ( *Id.* ¶13.) Koskowski stated that he did not ever recall being aware of Plaintiff's 2010 lawsuit against Superintendent Ercole, Senior Corrections

---

[3] Plaintiff attaches a letter from Medical Expert Dr. Gregory Mazarin M.D. (Plf. Aff. Ex. III) in which the doctor notes that the Plaintiff has a history of right knee problems.  As such, it is not entirely clear from the record that Plaintiff lied, in spite of Sgt. Murphy's conclusory statement.

Counselor Gonzalez or Corrections Counselor Daugherty. (*Id.* ¶14.) He testified that he never placed the Plaintiff so that Plaintiff's movement in housing would interfere with his access to the courts or commissary. (*Id.* ¶16.) Koskowski submitted that based on his years of experience, he knew that inmates file lawsuits on a daily basis and that targeting inmates who file lawsuits with retaliatory conduct would make his job as Deputy Superintendent of Security "completely untenable" in a facility that houses more than 2,000 inmates. (*Id.* ¶18.) He further testified that he did not interfere with the Defendant's law library requests nor was he involved in the packaging or transfer of Plaintiff's personal items. (Id. ¶20.) He did not destroy, lose or interfere with Plaintiff's property. (Id. ¶21.)

**B.    Use Of Force Incident**

Plaintiff testified that on February 1, 2011, an escort officer, Officer Castein, along with a porter escorted Plaintiff with his bags over to the A-Block. (Plf. Dep. Tr. 49: 11-19.) The officer and porter left upon arriving to the Block (Plf. Dep. Tr. 51:21-23), and then the Plaintiff carried his bags and a mattress up the stairwell by himself. ( Plf. Dep. Tr. 57: 21-25.) He testified that he put his bags against a wall near the stairwell when he came upon Defendant Officer Bresett who was in the control booth (Plf. Dep. Tr. 62: 14-19.) Plaintiff testified that Defendant Bresett told him he was in cell 202 and that he should "hurry up" and get his property into the cell. (Plf. Dep. Tr. 64:14-16.) Plaintiff testified that he moved his mattress and put it into the cell and then came out of the cell to pick up his property bags and move them as well. (Plf. Dep. Tr. 62:16-19.) Plaintiff said Defendant Bresett told him that he had to move faster and that he replied, "I'm moving as fast as I can." (Plf. Dep. Tr. 64:20.) Plaintiff testified that he asked for Officer's Bresett's name-tag because he was not wearing it. Plaintiff testified that Officer Bresett replied, "Why do you want my name?" and then said, "I'll give you my name all right." ( Plf. Dep. Tr.

65:9-13.) Plaintiff testified Officer Bresett went onto to say, "Yeah, because we don't take back talk over here." (Plf. Dep. Tr. 65:16-17.)

Plaintiff testified that Officer Bresett came over to him and attacked him with closed fists, punching him in the face. (Plf. Dep. Tr. 75: 6-10.) Plaintiff testified that he was beaten continuously for fifteen minutes by Defendant Officers Bresett, Gunsett, Brothers, Carlson, and Coffin. (Plf. Dep. Tr. 78:20-25; 91:15.) Contemporaneous medical records show he suffered a superficial scratch on his scalp, between two and three lacerations on his forehead, including a one-inch deep laceration and a cut on his upper lip. (Plf. Aff. Ex. VI.) During his initial evaluation by a nurse, he was spitting up blood and told the nurse he could not stand. (*Id.*) Plaintiff testified that he never hit any of the officers. (Plf. Dep. Tr. 92:16-18.) Plaintiff testified that the serious injuries suffered by Officer Bresett were caused by the other officers, who were hitting Bresett as well as the Plaintiff. (Plf. Dep. Tr. 101: 8-25.)

Defendants dispute this account. Officer Bresett states that upon Plaintiff Olutosin's arrival to the second floor of the A-Block, the Plaintiff asked him his name twice and that he gave Plaintiff his name. (Bresett Declaration ¶9.) He then told Olutosin to lock into his cell (*Id.* ¶12.) Officer Bresett said Plaintiff then struck him multiple times , causing substantial injuries, including a concussion, multiple red marks to his head and scratches to his face and arms, as well as a cut to his upper lip. (*Id.* ¶13.) Officer Bresett testified that at no point did he strike the Plaintiff. (*Id.* ¶18.)

Correction Officer Gunsett testified on the date and time of the incident he had been working his shift on the third deck of the A-block when he heard keys and a baton hit the ground. (Gunsett Decl. ¶¶ 8,9.) He immediately responded to the second deck to investigate (*Id.*), where upon arrival, he saw Officer Bresett on the ground holding the Plaintiff, in what he said appeared

to be an attempt to prevent the Plaintiff from hitting him. (Gunsett Decl.¶10.) Gunsett said he intervened by grabbing the Plaintiff from behind and taking him to the ground. (Gunsett Decl. ¶11.) Gunsett said, while on the ground, the Plaintiff continued to struggle and swung his fists at him. (Gunsett Decl. ¶12.)

Correction Officer Jason Brothers testified that when he responded to the red-alert issued during the incident, he arrived at the second deck of the A-block where he observed the Plaintiff on his back fighting and resisting Correction Officer Gunsett. (Brothers Decl. ¶¶6-7.) Brothers stated that Correction Officer Gunsett was trying to restrain the Plaintiff and gain his compliance. (*Id.*) Brothers said he observed the Plaintiff swinging punches at Officer Gunsett and so he grabbed the Plaintiff's left hand, and managed, he said, with assistance, to subdue him. (*Id.* ¶8) Brothers testified that with the assistance of other correctional officers, he applied mechanical handcuff restraints to the inmate's hands. (*Id.* ¶9.) Following orders, he helped in placing the Plaintiff onto his feet and then placed him in front of the officers' cage. (*Id.* ¶10.)

Both Defendants Aaron Coffin and Carlson submitted that they responded to the red alert. (Coffin Decl. ¶6; Carlson Decl. ¶6.) When each of them arrived, they testified that they saw Plaintiff standing on his feet, in handcuff restraints. (Coffin Decl. ¶6; Carlson Decl. ¶8) They were directed to escort the inmate to the special housing unit, which they did without incident (Coffin Decl. ¶7; Carlson Decl. ¶8.) Defendants Brothers, Coffin, and Carlson all stated that at no point did they observe any DOCCS staff, hit, kick or punch or use a baton on the Plaintiff. (Brothers Decl. ¶12; Coffin Decl. ¶7 and Carlson Decl. ¶9.)

Plaintiff stated he was dragged to the Special Housing Unit ("SHU")[4], from the A-block second deck by Correctional Officer Brothers, Gunsett or Carlson. (Plf. Dep. Tr. 125:1-12.)

---

[4] A housing unit where inmates are separated from the general inmate population.

Plaintiff said his personal property, a bag, containing legal materials, went missing while he was at the SHU. (Plf. Dep. Tr. 198:5-25.) He stated that the bag was placed in the A-block officer's bathroom. (*Id.*) Plaintiff bases his assertion on a response that he received to a grievance filed about his missing legal bag. (Plf. Dep. Tr. 200: 8-18.) Plaintiff attributes the missing legal bag to the foul play of officers from the A-Block. (Plf. Dep. Tr. 199:7.) Plaintiff said he believes the officers involved in the incident destroyed his legal bag. (Plf. Dep. Tr. 199:7.)

Plaintiff did not offer evidence that he saw any officer, including any Defendant, take, tamper with, or destroy his legal bag. All Defendants involved in the incident, along with former Deputy Superintendent of Security Koskowski denied having tampered, removed or destroyed Plaintiff's property. (Koskowski Decl. ¶¶20-21; Bresett Decl. ¶¶24-25; Brothers Decl. ¶¶18-19; Carlson Decl. ¶¶15-16; Coffin Decl. ¶¶14-15; Gunsett Decl. ¶¶24-25.)

### C.      Injuries And Subsequent Treatment Of Them

An injury report written by a nurse at Greenhaven stated that Officer Bresett's upper lip was swollen and cut, and the side of his face was swollen with a dime-sized bump on his temple. (*Id.* Ex. B.) The report stated he had red marks on the back of his head and neck. (*Id.*) Bresett stated that was required to take medical leave from the facility for three weeks in order to recover as a result of the incident. (Bresett Decl. ¶14.)

Plaintiff stated that five to ten minutes after he was dragged to the SHU, he was taken to the infirmary in a wheelchair for inspection of his injuries. (Plf. Dep. Tr. 127:23) He stated that his injuries were not adequately inspected. (Plf. Dep. Tr. 128:23.) Dr. Bentivenga, the staff physician who treated Plaintiff and is not a party to this case, testified that the Plaintiff was not cooperative during his initial medical evaluation. (Bentivegna Decl. Ex. A.) Plaintiff testified that  he was in pain, attempted to talk but could not. (Plf. Dep. Tr. 129:18-23.) Plaintiff said that

other officers came into the infirmary and taunted him while he was being treated. (Plf. Dep. Tr. 129:23-25.) He said that one of the officers who came into the infirmary and taunted him was Defendant Brothers. (Plf. Dep. Tr. 131:2-8.) Plaintiff stated that the examining nurse taunted and harassed him in asking him to speak louder, and was also handling him in a rough manner. (Plf. Dep. 133:19:24.) The Plaintiff said the nurse did not physically check his left eye injury but only took observational notes. (Plf. 137:14-20.) Plaintiff stated that he received delayed medical attention (Plf. Aff. ¶22.) although he was not specific about the nature or timing of the delay. In a use of force report, a Green Haven nurse wrote that the Plaintiff-Olutosin had a superficial scratch on his scalp, no bleeding, a one-inch laceration on his forehead, and a cut under his upper lip. (Plf. Aff. Ex. V.) A medical expert, Dr. Gregory Mazarin, later reviewing the report summed up Plaintiff's injuries: A superficial laceration of the forehead (1"), laceration of the inside upper lip (1/4"), superficial scratches on the scalp, a small abrasion of the left cheek, ecchymosis to both shoulders (2"-3"), a small right elbow ecchymosis (1"), and superficial abrasions to the mid-clavicular and lumbosacral area of the back. (*Id.*)

Plaintiff saw medical personnel six times during the month of February 2011, for a variety of medical conditions unrelated to the Feb. 1, 2011 incident, including celiac disease/gluten intolerance, a fungal rash, and body pains. (Bentivegna Decl. Ex. A. *passim*.) On February 7, Plaintiff stated to medical personnel he had a "tissue" in his vision. (Bentivegna Decl. Ex. A; Plf. Dep. Tr. 145:11-146:11.) Dr. Bentivegna found Plaintiff's complaints consistent with the symptoms for a detached retina. (Bentivegna Decl. Ex. A.) On February 13, 2011, Plaintiff filed a grievance about the treatment of his eye, which he alleged was injured after the incident. (Plf. Dep. Tr. 151:1-7.) On February 22, 2011, Dr. Bentivegna requested an outside consultation with an optometrist for the Plaintiff. (*Id*.)

On March 7, 2011, Defendant Dr. Bernstein, who was in charge of overseeing Green Haven's medical staff including approving outside consultations, approved the outside consultation for Plaintiff to be treated at a retinal clinic. (Bernstein Decl. ¶7.) Bernstein denied depriving Plaintiff of medical care or violating his constitutional rights. (Bernstein Decl. ¶12.)Bernstein had no contact with the Plaintiff or involvement in Plaintiff's medical care other than making the referral. (Bernstein Decl. ¶10; Bentivegna ¶6.) Plaintiff was diagnosed with a detached retina and treated at the retinal clinic on March 17, 2011. (Bentivegna Decl. Ex. A.) After multiple retinal clinic visits, Plaintiff received two procedures from outside providers, including a May 10, 2011 "vitrectomy OS with gas bubble" and "surgery to repair the detached retina" on June 15, 2011. (*Id*.)

Bentivegna testified that the Plaintiff received proper medical care to address his symptoms and complaints between Feb. 1, 2011 and July 5, 2011. (Bentivegna Decl.¶5.) He testified that he had never deprived the Plaintiff of medical treatment. (Bentivegna Decl. ¶ 11.) Two medical experts reviewed the Plaintiff's records and concluded that it was likely Plaintiff's detached retina resulted from his pre-existing condition, not the alleged use of force incident.  On Feb 2, the day after the incident, a medical report noted that the one-inch laceration on his forehead had scabbed over and that he had developed some swelling in his knee. (Plf. Aff. Ex. VI.) By Feb. 5, 2011 Dr. Mazarin, one of the two medical experts, stated that Olutosin had no reported injuries. (*Id*.) The health record progress note from Feb. 7, 2011, when Plaintiff reported seeing tissue in his eye, indicated the patient had a chronic visual field deficit and that there was a previous history of a detached retina. (*Id*.)

The Defendant's medical expert stated that when Plaintiff was seen by an eye doctor on March 7, 2011, Plaintiff's visual acuity was documented 20/400 in the left eye and 20/20 in the

right eye. (*Id*.) Dr. Mazarin wrote that Defendant's decreased vision on his left eye was unchanged from the prior measurement (20/400) taken back in 2009. (*Id*.)  A possible new retinal detachment was identified in the left eye and he was referred to a retinal clinic. (*Id*.) On March 17, 2018, Plaintiff was diagnosed with a macular hole and retinal detachment in the previously buckled left eye. (*Id*.) He was referred by Dr. Josephsburg to Dr. Charles for possible surgery and was evaluated on April 26. (*Id*.) In addition, Dr. Mazarin noted the Plaintiff's other injuries. Dr. Mazarin wrote that pain was reported to Plaintiff's right knee but no swelling was present. (*Id*.) Midsternal chest pain was also reported. (*Id*.) Dr. Mazarin wrote that on Feb. 2, the patient had described wrist and knee pain with discomfort bending over and taking a deep breath. (*Id*.) His forehead laceration was scabbed over. (*Id*.) His right wrist had a mild swelling and handcuff mark. (*Id*.) There was mild swelling above the right knee. (*Id*.) Mr. Olutosin was sent for X-rays of his right ribs but they turned out to be negative. (*Id*.)

On May 10, 2011, Olutosin underwent surgery to repair the detached retina. (*Id*.) However, on June 6 he was diagnosed with proliferative retinopathy and a new tear. (*Id*.) A revision surgery to repair the new tear took place on June 14. (*Id*.) Dr. Mazarin wrote in his letter that since the June 14 surgery, the Plaintiff's retina has remained in place with no significant changes in his vision. After reviewing his medical history, Dr. Mazarin wrote that "Although the sequence of events suggests it is likely the retinal detachment experienced by Mr. Olutosin was related to the trauma on Feb. 1, 2011, the initial retinal injury was probably very minor, considering that his symptoms did not develop until almost one week later." (*Id*.) Dr. Mazarin opined that none of the evidence suggested the retinal detachment experienced by the Plaintiff was consistent with his is excessive force claim, given the minor nature of his facial injuries and

with the understanding that patient's with a history of surgical intervention for the same retinal condition in the same eye, have a higher risk of a reoccurring retinal detachment. (*Id.*)

Robert Josephberg, M.D., an ophthalmologist, who examined the Defendant on March 17, 2011 at Westchester Medical Center in Valhalla, New York, also reviewed the patient's medical records and wrote an expert report on May 8, 2017. (*Id.*) Dr. Josephberg stated that Plaintiff suffered a major retinal detachment in 1984 but subsequent surgery reattached the retina. (*Id.* ¶15) He, however, was legally blind in his left eye after his first surgical procedure in 1984. (*Id.* ¶16) Dr. Josephberg characterized the Plaintiff's preexisting condition with prior retinal detachment as "significant." (*Id.* ¶21.) Dr. Josephberg wrote that the plaintiff's myopia along with his prior retinal detachment surgery in 1984, plus a thinning and stretching of his retinal led to his recent retinal detachment cause by the macular hole in 2011. (*Id.* ¶26) Dr. Josephberg concluded that the use of force incident alleged "has nothing to do with Plaintiff's retinal detachment; and that Plaintiff's preexisting conditions and his high myopia were the causes of the macular hole and retinal detachment. (*Id.* ¶ 27). The Doctor stated that there is a "high probability" that without trauma, the fact that he had a pre-existing condition was the cause of his macular hole and retinal detachment. (*Id.*) Dr. Josephberg pointed to the fact that the Plaintiff's photos and records produced from the 2011 incident showed no swelling or bleeding of either eye, as evidence that the detachment was only coincidence and due to his preexisting conditions in the left eye (*Id.* ¶29.)

Plaintiff has not presented any medical testimony that contradicts the opinions of Defendants' experts or any expert who connects Plaintiff's retinal injuries to the February 2011 use of force incident.

### D.     Complaints While in the SHU After the Alleged Use of Force Incident

Plaintiff submits that while he was in the SHU after the Feb.1 incident, he did not receive his requests for legal material from the law library and also, did not receive his mail regarding two court decisions. (Rule 56.1 Statement, ECF No. 139, ¶25.)

1.  *Law Library Material Grievance*

Plaintiff filed a grievance on February 3, 2011, regarding his inability to get the law library books he had requested. (Faherty Decl. Ex. L.) He was sent a response from a prison official, which stated the book he requested was unavailable, and that the library was in the process of ordering another copy. (*Id*.) He then appealed his grievance to the Superintendent of Green Haven, who in a written decision on March 11, 2011, reiterated that the book requested was unavailable and that the prison library was in the process of ordering another copy.  The grievant appealed to the decision to the Central Office Review Committee for the New York State Department of Corrections ("CORC") on March 11, 2011 because he disagreed with the Superintendent's response. He stated that although he had begun to receive the materials requested, that he only received the requested materials after filing a grievance. (*Id*.)  On June 8, 2011, after a full hearing, the CORC upheld the Superintendent's determination, and noted that in accordance with prison policy, law library materials are provided on a first-come, first serve basis. The CORC noted that the Plaintiff had received the materials he had requested. (*Id.*)

2.  *Mail Grievance*

Plaintiff testified that Defendant Ryan, as Supervisor of the Green Haven mail room, failed to adequately train and supervise unspecified mail room staff and "SHU processing staff," who, he said, prevented him from receiving his legal mail and denied his access to the law library. (Plf. Dep. Tr. 194:5-8.)  On or about March 15 and March 28, 2011, mail directed to

"William Riley"[5] did not match the facility records for the Department Identification Number or "DIN," listed on the envelope. (Murphy Decl. ¶6-7; Faherty Decl. Ex. Q.) No Defendant in the case was involved with any legal mailings addressed to "William Riley." (Plf. Dep. Tr. 192:17-20.) Ryan stated that at no point did he direct or seek out others, including his subordinates, to reject or tamper with mail that was sent to the Plaintiff. (Ryan Decl. ¶¶17-18.) Plaintiff also testified that he did not receive a court decision dismissing his 2010 lawsuit in the Southern District of New York on March 26, 2010 and thus, he stated he could not appeal the judgment. (Plf. Aff. ¶24.) In addition, Plaintiff stated that he did not receive a court decision from the Eastern District of New York on March 26, 2011 denying his habeas petition.[6] (*Id*.) He only found out about the habeas denial a year later while he was at a different facility after the time frame to appeal had already lapsed. (*Id*.)

Plaintiff did not identify any particular person who personally prevented him at any time from receiving mail. There are no facts in this record about a lack of training or supervision of mailroom personnel beyond Plaintiff's conclusory statement about it.

### 3. *Use of Force Grievance*

Plaintiff filed a grievance on February 11, 2011 regarding the alleged use of force incident and alleged harassment in retaliation for the lawsuit. (Faherty Decl. Ex. M.). On April 27, 2011, Superintendent William Lee, who is not a party to the current lawsuit,[7] denied Plaintiff's claim, noting that in alleging he was beaten unconscious and assaulted by staff, he had no witnesses to offer and nothing further to add to his complaint. (*Id.)* On June 22, 2011, the

---

[5] It appears Plaintiff has two names or had changed his name and his DIN number in the prison's computer system does not reflect that he has two names. (See Murphy Decl. ¶¶6-7.)

[6] His petition was denied in an order from Judge Dora L, Irizarry in *William Riley, pro se v. Superintendent James T. Conway*, No. 06-CV-1324 (E.D.N.Y. March 10, 211).

[7] Superintendent Lee was dismissed as a Defendant in the lawsuit in this Court's opinion, *Olutosin v. Lee*, No. 14-cv-685 (NSR) 2016 WL 2899275 (May 16, 2016).

Central Office Review Committee ("CORC") for the State's Inmate Grievance Program denied Plaintiff's grievance request unanimously. The CORC noted in its decision that the Office of the Inspector General investigated Plaintiff's allegations of staff misconduct but said they could not be substantiated. (*Id*.)

## II.        STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may also meet its initial burden that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *Fuertado v. City of New York*, 337 F. Supp. 2d 593, 599 (S.D.N.Y. 2004) ("The moving party may use a memorandum or brief to 'point to' the absence of evidence and thereby shift to the non-movant the obligation to come forward with admissible evidence supporting its claim.").

If the moving party fulfills its preliminary burden, the onus shifts to the non-movant to prove or raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A). The party asserting that a fact is genuinely disputed must identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting Fed. R. Civ. P. 56); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 244 (S.D.N.Y. 2001). The non-movant must support his assertion by "citing to particular parts of materials in the

records" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)). In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact."). Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250. When ruling on a defendant's motion for summary judgment, the "mere existence of a scintilla of evidence in support of plaintiff's position, will not be sufficient." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (2d. Cir. 1986). Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

When multiple parties have moved for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

Finally, the Court of Appeals instructs us to "read the pleadings of a *pro se* plaintiff liberally and to "'raise the strongest arguments that they suggest'" *McPherson v. Coombe*, 17 F.3d 276 (2nd Cir. 1999)(quoting *Burgos v. Hopkins*, 214 F.3d.787, 790 (2d. Cir. 1994). Pleadings

drafted by *pro se* plaintiffs moving for summary judgment are not held to the same "stringent standards" as "formal pleadings draft by lawyers." (*Shariff v. Poole*, 689 F.Supp.2d 470, 476 S.D.N.Y. January 20, 2010). On the other hand, *pro se* plaintiffs cannot simply make "bald" assertions that are unsupported by the evidence. (*Id.*)

## III.    DISCUSSION

### A.    Retaliation Claim

The gist of Plaintiff's retaliation claim under §1983 is that the Defendants violated his First Amendment rights by retaliating against the Plaintiff for filing the 2010 lawsuit.  The Plaintiff contends that the retaliation consisted of  (1) deliberately moving Plaintiff to different double-bunk cells every few days to prevent Plaintiff from accessing the law library and making commissary purchases, (2) confiscating property; (3) using excessive force against him and beating him up, (4) denying Plaintiff medical treatment and care, and (5) impeding Plaintiff's access to court.  Private use of a cell or a limited number of movements is not a constitutional right that allows this lawsuit to proceed.

To meet the elements of a prima facie First Amendment retaliation claim, a moving party must proffer evidence showing: (1) The speech or conduct at issue was protected; (2) That the Defendant took an adverse action against the Plaintiff; and (3) That there was a causal connection between the protected speech and the adverse action.  *Mt. Health City School Dist. Bd. of Educ. V. Doyle*, 429 U.S. 274 (1977); *Gil v. Pidlypchak*, 389 F.3d 379, 380 (2d. Cir. 2004).

"Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir.

1988). On the other hand, the Second Circuit cautions courts to recognize "the ease with which claims of retaliation may be fabricated" and therefore, to handle prisoner retaliation "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d. Cir. 1995).

Plaintiff's 2010 lawsuit clearly constitutes protected conduct. *Espinal v. Goord*, 558 F.3d 119, at 128-29 (2d Cir. 2009) so we need not engage in an extensive analysis of the first element.

For the second element, in the prisoner context, a plaintiff has the burden of showing that the claimed retaliatory acts were not merely *de minimis* acts of harassment but rather, the retaliatory actions could deter a "similarly-situated person of ordinary firmness from exercising his or her constitutional rights." *Dawes v. Walker* 239 F.3d 489, 493 (2d Cir. 2001). "The test is an objective one, meaning it does not turn on whether the Plaintiff was in fact deterred from continuing to file his grievances." *Allah v. Poole*, 506 F.Supp.2d 174 (S.D.N.Y. August 14, 2007). Prisoners "may be required to tolerate more" than the average complainant. *Dawes*, 239 F.3d at 491[*citation omitted*].

### 1. *Cell Movements Are Not Adverse Actions*

Inmates have no right to stay put in one particular cell, especially if they pose a security risk or ask to be moved to a different cell, as was the case on at least one occasion in the case at bar. Plaintiff's transfer to the SHU was less than 101 days of confinement, what our Circuit has determined is the upper limit of normal confinement conditions. *Ortiz v. McBride*, 380 F.3d 649, 654 (2d. Cir. 2004) (citing *Sealey v. Gitner*, 197 F.3d 578, 589 (2d. Cir. 1999)). While the *Ortiz* Court suggested abnormality and significant hardship could be proven in some instances where the prisoner endured unusually harsh conditions for a period that was less than 101 days, Plaintiff has not proven that was the case here. Plaintiff stated the movements limited his access to the

law library and the commissary. Here, the Plaintiff has not pled that somehow the cell movements inhibited his ability to sleep, the cells were unsanitary or that he was placed at substantial risk of serious harm.See *Walker v. Schult,* 717 F.3d 119, 126-128 2d. Cir. 2013.

2. *Restricted Access to Law Library and Commissary Are Not Adverse Actions.*

There is no unfettered right to access the prison law library. *Oliver v. Head Sheriff of Dept. & Div. of Correction of Nassau County*, 2008 WL 238577, at *2 ("The Constitution guarantees meaningful access to the Courts, and, unless adequate alternatives exist, reasonable access to a law library is required part of that access. However, the Constitution does not require unlimited and unrestricted access to a law library at the demand of a prisoner")(*citations omitted*). The United States Supreme Court has held that a correctional facility's decision to restrict 'lockdown prisoners' access to law libraries' deserve substantial deference, 'since the inmates in lockdown include 'the most dangerous and violent prisoners in the [ ] prison system,' and other inmates presenting special disciplinary and security concerns." *Merriweather v. Sherwood*, 235 F.Sup.2d 339, 348 (S.D.N.Y. 2002) (quoting *Lewis v. Casey*, 116 U.S. 343, 348 (1996)). Furthermore, the Supreme Court has shown that in order to state a claim, an inmate must show "the alleged inadequacies of a prison library's facilities or legal assistance program caused him 'actual injury'—that is, "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim." *Lewis*, 116 U.S. at 348. Plaintiff, while in the SHU, was temporarily unable to get books from the library, which he ultimately ended up receiving. The temporary inability to get access to a book because it is unavailable or checked out by another inmate, is a minor inconvenience and does not constitute an adverse action.

Equally, there is no constitutional right to access a prison commissary." *Mitchell v. City of New York*, 2011 WL 1899718 at *2. It is a privilege not a right. Nor would prohibiting access to the commissary deter an inmate from exercising his legal rights.

### 3. *Claim that Property Was Confiscated Lacks Facts.*

As another adverse action, Plaintiff claims that the Officers in the A-block deliberately confiscated his property. However, in order to prevail on the claim, Plaintiff would have to show that the Defendants intentionally lost or destroyed his property. *Roseboro v. Gillespie*, 791 F.Supp.2d 353 (2011). There is no such evidence in this record, in particular because Plaintiff did not identify any particular Defendant that lost or destroyed his property. Furthermore, plaintiff has not proven that not receiving his mail constituted an adverse action—it appears it was a simple mail error.

### 4. *Use of Force Incident May Be Adverse*

As explained in further detail below, there is a dispute of material fact on the limited issue about how the fight between Plaintiff and the Defendant began, and whether the injuries to his forehead, scalp and lip constitute excessive force as stated below in Section IIIB. An assault, "may constitute an adverse action under [the] First Amendment even without rising to the level of an Eighth Amendment excessive force violation." *Morgan v. Luft*, No. 9:15-CV-0024 2017 (GTS/DJS) WL 9511158 at *8 (N.D.N.Y. June 22, 2017).

### 5. *Failure to Show Delayed Medical Care.*

There is no meaningful evidence that Plaintiff received delayed medical treatment and care, constituting an adverse action. The undisputed testimony is that medical officials at the prison saw Plaintiff six times after the incident in the month of February. Contemporaneous

medical records show Plaintiff was uncooperative during his medical exam with a nurse after the incident. Plaintiff testified that the reason for this, is that he was in pain, and therefore could not communicate with the nurse. However, Plaintiff proffers no evidence to back up his blanket assertions that his medical care was delayed or botched, or in his own words, that the nurse who examined him was "in cahoots" with the Defendants. (Plf. Aff.¶22.)

In short, the record shows that the Plaintiff only met the second required element for a retaliation claim, insofar as there is a dispute of material fact over whether Defendants took an adverse action in their use of force against him, which prevented him from exercising his Constitutional rights.

However, for the third element, the causation requirement, Plaintiff has offered no evidence to show a retaliatory motive, much less one that is "'sufficiently compelling.'" *Tirado v. Shutt*, 2015 WL 774982 at *10 (W.D.N.Y. February 23, 2015) (quoting *Bennett v. Goord*, 343 F.2d 133, 138-39 (2d. Cir. 2003)).

Here, the fatal flaw is that Plaintiff cannot show that 2010 lawsuit was "a substantial motivating factor" in the alleged adverse actions. Plaintiff proffers no evidence that any of the Defendants were aware of the 2010 lawsuit. None of the Defendants in the current lawsuit were parties to the 2010 lawsuit. *See Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (retaliation not reasonably inferred where plaintiff's complaint 10 weeks earlier did not involve defendant alleged to have retaliated against him). While it is possible that a Defendant-Correctional Officer could be retaliating against an inmate for lawsuit against other correctional officers at a facility, *Vincent v. Sitnewski*, 117 F.Supp. 329, 338-339 (2015), here the Plaintiff offers no specific evidence tying any Defendant's actions to his lawsuit. The fact that his lawsuit was pending when the conduct occurred, is insufficient to survive a motion for summary judgment. Temporal

proximity, alone, will not win a motion for summary judgment.. *Faulk v. Fisher*, 545 Fed.Appx. 56, 58 (2d. Cir. 2013); *see also*, *Tirado*, 2015 WL 774982 at *10.

The only evidence Plaintiff proffers that Defendants were targeting him for his 2010 Lawsuit is that an unidentified officer told him, "That's what happens to inmates who file lawsuits" after Plaintiff complained about his missing typewriter. His inability to identify who made the statement is a fatal. "The personal involvement of a defendant is a prerequisite for the assessment of liability in a Section 1983 action." *Clark v. Gardner* 256 F.Supp.3d 154, 164 (2017)(citing *McKinnon v. Patterson*, 568 .2d 930 934 (2d. Cir. 1977). Plaintiff admitted in testimony to not having any personal knowledge of any Defendant's awareness of his 2010 Lawsuit.

Nor does the §1983 statute allow a plaintiff to base claims on a theory of respondent superior liability, as the Plaintiff attempts to do here against Defendant Koskowki and Defendant Ryan. *Polk County v. Dodson*, 454 U.S. 312, 453 (1981); *Gardner*, 256 F.3d. at 164. The Plaintiff must show a "tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260 2d. Cir. 1986); *See also*, *Fair v. Weiburg*, 2006 WL 2801999 at *4 ("Personal involvement, in this context, means 'direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates.'" (quoting *Black v. Coughlin*, 76 F.3d 72, 74 (2d. Cir. 1996)).

There is no evidence that Defendant Koskoswki personally ordered Plaintiff to be moved or ordered his subordinate to do so based on any retaliation for the 2010 Lawsuit. Rather, on at least one occasion Plaintiff requested to be moved and on other occasions he was moved on account of misbehavior. The same analysis applies to Plaintiff's claims against Defendant Ryan.

Plaintiff argues that Defendant Ryan failed to train his subordinates properly and because of that purported failure, Plaintiff did not receive his mail and law library requests. However, there is no evidence that Defendant Ryan created a policy or custom of unconstitutional practices or was grossly negligent in managing subordinates in the mail facility. Plaintiff admits that Defendant Ryan did nothing personally to sabotage his legal mail. Defendants' evidence is that because of Plaintiff's mail was addressed to "William Riley," a different name than the one currently in the computer system, his mail was not received and that it was returned to its sender.

In sum, although there is evidence to support the first and second elements of Plaintiff's retaliation claim, the record is void of any evidence to establish the third "causation" element. Accordingly, the Court must grant summary judgment in favor of Defendants and dismiss Plaintiff's retaliation claim.

## Excessive Use of Force Claim

Excessive use of force is a claim under the cruel and unusual provision punishment of the Eighth Amendment of the U.S. Constitution and requires courts to engage in a two-part inquiry, one objective and the other subjective. The subjective inquiry focuses on the defendant's motive and the objective inquiry on the conduct's effect. *Wright,* 554 F.3d at 268.

First, under the subjective test, a prisoner must show that the Defendant acted with a "'sufficiently culpable state of mind'" that the "alleged wrongdoing was objectively harmful enough to establish a Constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). Plaintiff must show that the Defendant acted with "'wantonness in light of the particular circumstances surrounding the challenged conduct.'" (*Wright*, 554 F.3d at 268 (quoting *Seiter*, 501 U.S. at 299)). The test for wantonness

hinges on "whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Scott v. Coughlin*, 344 F.3d 282, 291(2d. Cir. 2003). To determine whether Defendants acted maliciously or wantonly, a court must examine several factors including the extent of the injury or the mental state of the Defendant, as well as "the need for the application of the force; the correlation between that need and the amount of the force used; the threat reasonably perceived by the Defendants, and any efforts made by the Defendants to temper the severity of a forceful response."

Under the objective test for cruel and unusual punishment, courts look at the harm done, in light of "contemporary standards of decency." *Hudson*, 503 U.S. at 8 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). However, Courts have stated that in the excessive force context, there is essentially strict liability. *Hudson*, 503 U.S. at 9 ("In the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated."). On the other hand, not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)(quoting Hudson, 503 U.S. at 9). Furthermore, while the nature of the injury can provide evidence of the use force, injuries alone are not dispositive. *Wilkins*, 559 U.S. at 38 ("Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.").

### Injuries to Scalp, Forehead and Lip

Plaintiff is his deposition testimony and affidavits stated Defendant Bresett threw the first punch in the use of force incident that occurred on Feb. 1. He then testified that the Defendants

beat him until he was unconscious for 15 minutes. Defendant Bresett disputes his testimony. Defendant Bresett testified that the Plaintiff struck him multiple times after he told him to lock his cell. Another correctional officer, Defendant Gunsett, testified when he arrived to the scene of the incident, he saw Officer Bresett holding the Plaintiff on the ground, in what appeared to be an attempt to prevent the inmate from hitting him further. He testified that when he intervened, grabbing the Plaintiff from behind and taking him to the ground, the Plaintiff continued to struggle and swung his fists at him. Defendant-Officer Brothers stated, he observed the Plaintiff swinging punches at Defendant Gunsett.

The accounts of three correctional officers suggests there was a rationale need for the application of the force and that they reasonable applied that force in order to subdue the Plaintiff and restore discipline. However, since there are competing accounts concerning who initiated the Feb. 1 incident and under what circumstances the Plaintiff was restrained, such determination must be made by weighing the evidence and making credibility determinations. Such issues cannot be determined in a motion for summary judgment. Moreover, an examining nurse wrote down in the medical record soon after the incident that the Plaintiff suffered a superficial scratch on his scalp, between two and three lacerations on his forehead, including a one-inch deep laceration, a cut on his upper lip, in which the bleeding had subsided. He was also spitting up blood and told the nurse he could not stand. This may constitute excessive force, depending on whether the trier of fact concludes Defendants used force "gratuitously and sadistically" to cause harm in violation of "contemporary standards of decency."

While Defense Counsel argues that Dr. Mazarin testified that Plaintiff's injuries were not consistent with the brutal assault, this Court cannot grant summary judgement in Defendant's favor on that basis alone. An excessive force claim does not turn on the severity or lack thereof

of Plaintiff's injuries. This would only address the objective component of the law and would fail to address the subjective component at issue: Did Officer Bresett and the other defendants use force on the Plaintiff to discipline him and restore order or did they beat him gratuitously and sadistically? This is not a question for a doctor. This is a question of a trier of fact.

*Retinal Detachment*

Six days after the use of force incident, Plaintiff first complained about tissue in his vision, what medical professionals would eventually diagnose as a detached retina. Plaintiff claims that the detached retina was due to the use of force incident against him, and signifies that the correctional officers used excessive force against him. However, evidence from two medical experts suggests that Plaintiff's detached retina was not consistent with the use of excessive force against him.

Dr. Mazarin, an emergency room physician, acknowledged that Plaintiff suffered from a retinal detachment that occurred one week after the Feb. 1 incident.

However, given that the Plaintiff's facial injuries from the Feb. 1 incident were extremely minor, Dr. Mazarin concluded it was unlikely the result of excessive use of force. Most importantly, as Dr. Mazarin stated, given the Plaintiff's history of a previous surgical intervention for a retinal detachment, that none of the evidence was consistent with the Plaintiff's claim of excessive use of force. Dr. Mazarin opined to a reasonable degree of medical certainty that Plaintiff's detachment was due to a preexisting condition and not caused by the Feb. 1 incident.

Likewise, Dr. Josephsburg, one of the physicians who treated the Plaintiff, stated that the use of force incident "has nothing to do with Plaintiff's retinal detachment" and that there was a

"high probability that without the trauma, the fact that he had a pre-existing condition was the cause of his macular hole and retinal detachment."

Plaintiff does not offer any contrary medical evidence to rebut this testimony and therefore, he cannot satisfy the objective or subjective tests to sustain a cruel and unusual punishment claim.  In this instance, two medical experts testified to a reasonable degree of medical certainty that it was unlikely the use of force incident was a "but for" cause of Plaintiff's injury, rather it was his preexisting condition that was more likely the cause of his eye injury. Accordingly, any claims asserted by Plaintiff that Defendant used excessive force resulting in a retinal detachment must be dismissed as previously discussed.

It is unnecessary to address at this time Defendants' immunity claims for Defendant Bernstein and Defendant Ryan given that the claims of retaliation against them were dismissed as previously discussed. Furthermore, neither Defendant Bernstein nor Defendant Ryan were personally involved in the use of force incident and there was no evidence in the record that they were personally involved in any Constitutional violation related to the other Defendants alleged excessive use of force.

There also is no evidence in the record that showed Defendant Koskowski's "distinct acts or omissions" were the "proximate cause of the use of that force." *Blyden v. Mancusi*, 186 F. 252, 264 (1999). There was no evidence he had constructive or actual notice of unconstitutional practices and that he demonstrated deliberate indifference to Plaintiff's claims. (*Id.* at 265) (quoting *Meriwether v. Coughlin*, 978 F.2d. 1037, 1048 (2d. Cir. 1989)).

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion is DENIED in its entirety. Defendants'
CROSS-MOTION for Summary Judgment is GRANTED to the extent of dismissing Plaintiff's
claims of retaliation and dismissing any claims that Plaintiff suffered a retinal detachment as a
result of the allegation of excessive use of force, and DENIED as to Plaintiff's remaining claim
of excessive use of force. The Clerk of the Court is respectfully requested to terminate motions at
ECF No. 136 and ECF No. 140. The Court directs both parties to appear on December 12, 2018
at 10 a.m. in Room 218 at the Hon. Charles L. Brieant Jr. Federal Building and Courthouse, 300
Quarropas Street, White Plains, New York, 10601-4150.  Defendant's Counsel is directed to
make arrangements with the Plaintiff's correctional facility to permit the Plaintiff to appear at the
conference telephonically. Defense Counsel must appear in person. The Clerk of the Court is
respectfully directed to mail a copy of this Order to Plaintiff's address as listed on ECF and show
proof of such service on the docket.

Dated:    October 18, 2018                                    SO ORDERED:
          White Plains, New York

                                                             NELSON S. ROMÁN
                                                         United States District Judge